## CHARLES H. ATKINS, *et al.*

*vs.*

## FREDERICK LITTLE, CHARLES McGLASHEN, *et al*

The lien law of August 12, 1858, *Pub. Stat. ch.* 86, which provides that one who furnishes material or machinery for constructing, altering or repairing any building, by virtue of a contract or agreement with the owner thereof, has a lien to secure payment therefor upon such building, and upon the right, title and interest of such owner in and to the land upon which it is situated, includes the owner in equity thereof as well as at law.

If such material is sold to such owner, and he gets it for the purpose of erecting or repairing a building, and this was the mutual understanding or agreement, either expressly or by implication, the material man would have such lien, though the particular building was not, at the time, understood, referred to or mentioned; and though there should have been a written contract for such materials, it would by no means follow that a lien should be therein contracted for, or that it should appear thereby for what buildings the material was destined.

The court below, which tried the case without a jury, found as a fact, that the engine, fixtures and machinery in question were purchased of plaintiffs by defendant L. the then equitable owner of the lot and mill in question, for and to be used upon said lot and in said mill; but that there is no evidence that plaintiffs had any knowledge of what particular lot or property the same was designed for, or to be located upon. *Held*, that this amounts to a finding, that there was an understanding between the parties, that the engine, &c., was for a steam saw-mill of L.'s, entitling plaintiffs to such lien.

Said contract provided that said material should be paid for in full in cash on delivery at LaCrosse; but, instead thereof, plaintiffs delivered it to L. at Red Wing, (where said mill was situated,) without such payment. *Held*, that these circumstances warrant the assumption, that plaintiffs parted therewith upon the understanding that it was to go into said mill; and under said modi-

fication of the contract, the plaintiffs' rights are to be tested by the state of facts at the time of such delivery ; and that the law gives to plaintiffs, to secure to them payment for such engine, &c., so furnished to L. upon credit for his mill, under a contract with him and used by him therein, a lien thereon and on said lot, as against a subsequent purchaser in good faith and without notice.  Said lien attaches on such delivery, liable to be defeated, if no such account, as is provided for by statute, were filed within a year thereafter in the registry of deeds.

Plaintiffs filed within the year a detailed statement of the engine and appurtenances, and that they were furnished, in pursuance of an annexed written contract, to F. L. by plaintiffs, for, and used in repairing and building said mill; of the amounts paid on the contract price with the dates of payment and of the amount unpaid and claimed to be due, which was sworn to as a true and correct account of the machinery and materials furnished by plaintiffs to and for said F. L., who was also stated to have been, at the time of the furnishing and using, the owner of the mill, and of an equitable interest in said lot.  *Held*, a sufficient account under said lien law.  *Held*, also, that it was immaterial, that plaintiffs are non-residents, and that said contract was made and originally to be performed out of the state, though in fact performed on plaintiffs' part in this state

At the time said engine, &c., was so delivered and placed in said mill, said F. L. was the equitable owner of said lot and mill, and in possession thereof under a contract from one J. L. to convey the said lot to T. J L., on payment of certain notes given for the purchase price thereof, assigned by said T. J. L. to A. to secure the joint notes of said T. J. L. and F. L., given for materials, &c., for said mill, and in which lot, mill and contract said T. J. L. had sold all his interest to said F. L., and said F. L. was entitled to a deed from said L. of said lot, upon payment of the amounts due to J. L. and A. respectively.  Prior to the furnishing of such engine, &c., defendant McG., being in advance to said F. L. for moneys to be repaid from proceeds of lumber sawed at said mill, had made a verbal agreement with said F. L. that McG. should advance $1,400, for a new engine for said mill, to be procured by said F. L. in Chicago, and that said F. L. should secure him on his interest in said mill and lot; and F. L. contracted for said engine, paying $550 thereon, furnished by McG. therefor, and McG. advanced $115 more on the delivery thereof, and afterwards, at F. L.'s request and for him, paid plaintiffs in person $750 more on account of the price of said engine, &c.  Subsequently to the delivery and setting up of said engine aforesaid, and before the filing of said account, said verbal agreement was superseded by an agreement, in pursuance of which F. L. sold defendant S. an undivided half of the lot and mill for $2,000, which was paid

by S. to McG. upon his said advances; said McG. compromised and settled the indebtedness of F. L. to A., and took an assignment of said contract from A. to himself and S.; and said McG. and F. L. procured said J. L. to take their joint security for said purchase price of said lot, and execute to said McG. and S. a deed in fee thereof; the undivided half of which lot thereby conveyed to McG. was, by said agreement, to be held by him as security for the balance of said F. L.'s indebtedness to him. *Held*, that said S. took one undivided half of said property in fee, and McG. the other to secure his said advances, subject, however, as to both S. and McG., to a lien in favor of plaintiffs, to secure the unpaid balance of the purchase price of said engine, &c., which can be enforced by a sale of said property on execution.

The plaintiffs, as partners, sold to defendant Little a steam engine, machinery and materials, and brought this action in the district court for Goodhue county, to recover from him the amount remaining due upon the sale, and also to establish and enforce a lien for such amount against the articles sold, and against a steam saw-mill, in which they had been placed and used by Little, and against the lot in which such mill was situated. The defendants, McGlashen and Sanderson, were made parties to the suit, as claiming an interest in the lot against which it was sought to enforce the lien. McGlashen alone answered the complaint, claiming title to all the property in question, paramount to plaintiffs' alleged lien.

The action was tried by the court without a jury, and the judge found the facts substantially as follows:

On the 19th of April, 1862, one James Lawther, being seized in fee of lot one in block fifty-one in the city of Red Wing, (the lot in question in this action,) contracted in writing to convey the same to one Thomas J. Little, upon payment of a certain sum at a future time, and on the same day gave possession of the lot to Thomas J. Little and the defendant Frederick Little, who at once, out of their joint means and for their joint benefit, erected thereupon a steam saw-mill. On the 10th, and again on the 27th of May, 1862, Thomas J. as-

signed in writing to one Akers, his contract from Lawther, to secure certain notes, made by himself and Frederick, and given for an engine and machinery for the mill. The Littles continued to occupy and operate the mill on joint account until the spring of 1865, when Thomas J. verbally sold to defendant Frederick all his interest in the mill, the lot and the Lawther contract; and, in pursuance of such sale, surrendered possession of the mill to Frederick, who thereafter continued in sole and exclusive possession of the same.

On or about the 31st of August, 1865, the engine in the mill broke down. At this time defendant Fred. Little was indebted to the defendant McGlashen for advances on logs, to be repaid in lumber to be sawed at the mill. Between August 31st and September 6th, 1865, to enable Little to resume work and repay such advances, it was verbally agreed between Little and McGlashen that the latter should furnish Little $1,400, the supposed cost of a new engine, &c., taking security for such advance upon Little's interest in the mill and lot, and that Little should go to Chicago, and buy such engine, &c., of the plaintiffs, (whose names they had,) or of other parties, on the best terms practicable; and McGlashen then furnished Little $600 under this agreement.

Little at once went to Chicago, and on the 6th of September 1865, at Chicago, contracted in writing with plaintiffs for the engine &c., in question in this action. By the terms of the contract plaintiffs were to build the engine, &c., and to deliver the same on the cars, marked and shipped for Red Wing, on or before September 27th, 1865, and Little was to pay for the engine &c., $1,800, $550 was to be paid on the signing of the contract, and the balance on the receipt of the engine, &c., at LaCrosse, Wisconsin. Little paid down the $550 out of the $600 furnished him by McGlashen, and on his return to Red Wing informed the latter of the purchase and its terms. The en-

gine &c., was manufactured and forwarded by plaintiffs, arriving at Red Wing and being received by Little October 22d, 1865, when McGlashen paid the freight and charges, amounting to $114.21, and the engine, &c., was at once placed by Little in the mill, where it has since remained. On the 9th of November, 1865, Little by the hand of McGlashen paid to plaintiffs the further sum of $750, making the sum of $1,464,21, advanced by McGlashen to Little on account of the engine, &c., and leaving a balance of $500 due from Little to plaintiffs.

After the engine, &c., had been placed in the mill, defendant Little sold the lot and mill to defendants McGlashen and Sanderson upon the following terms : Sanderson was to pay McGlashen $2,000, and have a deed in fee in his own right of one undivided half of the lot and mill, and McGlashen was to have a deed in fee of the other undivided half, to be held as security for the balance of Little's indebtedness to him. To carry out this agreement, McGlashen and Sanderson, on the 26th of October, 1865, compromised the debt of Little to Akers for $500, which they paid and took from Akers an assignment in writing of the Lawther contract; and on or about the same day, to carry out said agreement, and to secure Lawther the amount due on said contract, (on which nothing had been paid,) Little and McGlashen executed to Lawther their joint bond, conditioned for the payment of a certain quantity of lumber, and received from him a deed in fee of said lot, the old contract being surrendered. A part only of the amount secured by this bond was ever paid. Prior to the 26th of October, but after the engine, &c., had been placed in the mill, Little delivered possession of the premises to McGlashen and Sanderson, under the sale to them.

On the 20th of February, 1866, the plaintiffs made an account in writing, of said engine, &c., verified on that day at Chicago by one of their firm, to which account was attached

a copy of the contract between plaintiffs and defendant Little, which account and contract, with a claim of lien from September 6th, 1865, against the lot, mill, engine, &c., in question, were duly recorded in the office of the register of deeds for Goodhue county on the 27th of February, 1866.

The eighth finding of fact in the court below describes the nature of Frederick Little's interest in the lot and mill; and the tenth finding describes the purpose of Little in the purchase of the engine, &c. These findings are stated at large in the opinion.

As conclusions of law the judge found that plaintiffs were entitled to judgment against defendant Little, for $500, with interest from October 22nd, 1865, and costs; but that plaintiffs were not entitled to any lien upon the lot, mill, or engine, &c., nor to any judgment establishing or enforcing such lien. Judgment was entered accordingly, and the plaintiffs appeal from so much thereof as denies their claim of a lien.

WILDER & WILLISTON, for Appellants.

PHELPS & TABER, for Respondent

*By the Court.*—RIPLEY, CH. J.—The judge, before whom this case was tried without a jury, finds as matters of fact, that on April 19th, 1862, by contract of that date under their hands and seals, one James Lawther agreed to sell to one T. J. Little lot No. one in block No. fifyt-one in Red Wing, and to execute and deliver to him a warranty deed thereof, upon condition that said Little should pay therefor $300, as follows: his three promissory notes, payable in lumber at as low a price as the same quality of lumber could be bought in Red Wing, as follows: $100 on demand after June 20th, 1862, $100 in one year, and $100 in two years thereafter, with ten per cent. per

annum interest till paid, payable annually; said Little agreeing to pay said sums, and also to deliver said lumber at such times and in such quantities and of such quality, as said Lawther elected, the amounts so delivered to be endorsed on said notes; and to pay all future taxes; and, in case of default on his part in any respect, said Lawther might consider the contract as forfeited, and dispose of the lot as if no such contract had been made.

That thereupon Lawther gave said Little and defendant Frederick Little possession, who, from their joint means and for their joint benefit, immediately erected a steam saw-mill thereon, ever since and now used as such.

That said Littles having bought of one Akers a steam engine for such mill, giving therefor their eight joint notes for $100 each, said T. J. Little assigned said written contract to said Akers as security therefor, and, on May 27, 1862, to secure two other like notes given for other machinery for said mill, made a further assignment in writing of said contract to said Akers.

That the Littles jointly occupied and ran said mill on joint account until the spring of 1865, when said T. J. Little verbally sold to said Frederick all his right title and interest in and to said lot one, and said mill and said contract, and, under and in pursuance of said sale, surrendered to him sole and exclusive possession of said lot and said mill.

And the court further finds, that from that time said Frederick was the equitable owner of said lot and mill, subject to Lawther's rights under said contract, and said Akers' under said assignment; and that, upon the payment by him to Lawther of the amount due on said contract, and to Akers of the amount due on said notes to him, said Frederick was entitled to a deed in fee from said Lawther of said lot.

The respondent has argued this branch of the case, as if

this last finding were a conclusion of law from that which precedes it; but it is expressly found as a fact, and we do not perceive upon what principle we are to assume, against such an express statement, that it is a conclusion of law, and to proceed to consider whether the facts previously set out do or do not support it. It would not only be mere assumption, but an assumption in the face of circumstances appearing in the case, tending strongly to show that it was an erroneous assumption. For instance, the circumstance that Lawther gave possession to both the Littles, coupled with the other facts respecting their use and occupation of the property, tends to show that the lot was bought for the firm as partnership property, and that Lawther knew it; and the further fact appears, that, when Frederick Little, subsequently to Thomas J.'s sale to him, made the arrangement hereinafter stated, Lawther accepted his and defendant McGlashen's bond as security for the amount due him upon said contract, [nothing having been paid on it,] and executed a warranty deed to defendants Sanderson and McGlashen; whereby it appears, said debt having then been long overdue, not only that said Lawther had waived any right of forfeiture by reason thereof, but that, in as much as the assignments to Akers are stated to have been made as security for the debt of T. J. Little and F. Little, on payment of which Akers would have been bound to re-assign to T. J. Little or his order, Lawther could not, without some such order or authority from T. J. Little so to do, have conveyed to McGlashen and Sanderson. It is, therefore, more than likely that Lawther had agreed, at the Littles' request, when T. J. sold to Frederick, to convey to the latter as sole owner in equity of the property; an agreement, the validity of which, though verbal, (if it were so,) no one but Lawther could dispute on that account. If he recognized it, and, in pursuance thereof, conveyed the property on F. Little's order,

the appointee of F. Little, (the defendant here,) cannot dispute it. The probabilities, therefore, seem to be against any mistake of the court below in placing the finding in question among the findings of fact.

But further, looking only at the facts above mentioned and stated by the court, previously to the finding in question, while it is true that this case lacks one element of Gill vs. Newell, 13 Minn. 462, in that there Newell delivered the written contract to Gill when he gave him possession, which it was not in T. J. Little's power to do, there is, nevertheless, as good a part-performance of the verbal contract in this case as in that, for when the court finds, as it does here, that T. J. Little *sold* his interest, it is to be understood that he received value therefor, and though payment alone is not a good part-performance to take a verbal contract out of the statute, payment and taking possession, under and in pursuance of a verbal contract, has always quite uniformly been. *Browne Stat. Frauds, sec.* 465.

And as the object of this verbal contract was the same as in Gill vs. Newell, viz., that Frederick might become the owner of the land; as the intention of the parties on a sale of all T. J.'s interest in the land, the mill and the written contract, is certainly as clearly shown to have been to assign the written contract to Frederick, as such an intention is, in Gill vs. Newell, held to appear from the verbal agreement there proved, that case seems to be a direct authority for holding in this case, that the effect of the verbal contract, if valid, between the Littles, was to transfer the equitable ownership of the land, and T. J.'s rights under the written contract, to Frederick, so as to enable him, through T. J. or in some other way, to obtain the legal title; and in which way, as between them, was immaterial. *Gill vs. Newell,* 13 *Minn. p.* 470.

But there being a good part-performance, the contract was valid in equity, (*Ib. p.* 470,) and so all parties have regarded it,

and have treated F. Little as the owner of the property, as appears from the further facts found.   These facts are, in substance, that McGlashen made large advances to F. Little, under an agreement between them in the logging business, and in and about the running expenses of said mill, to be repaid from the proceeds of lumber sawed by said Littles at said mill; and between Aug. 31st and Sept. 6th, 1865, (the old engine having failed,) these two men made a verbal agreement that McGlashen should advance $1,400 for a new one, to be purchased by Little in Chicago, and that Little should secure him on his interests in said mill and lot; but which verbal contract was afterwards superseded by the arrangement hereinafter stated.   Little, meantime, however, under this bargain, contracted with plaintiffs for a new steam engine and appurtenances, paying on the execution of the contract $550, furnished him by McGlashen therefor, who, on the arrival of the engine at Red Wing, advanced about $115, freight and charges, and afterwards, Nov. 9th, McGlashen personally, at Little's request and for him, paid plaintiffs on said contract the further sum of $750.   The engine was received and put into the saw-mill by said Little, Oct. 22d, 1865; and thereafter, and before the filing of the claim for lien hereinafter mentioned, the following agreement was made:   Little sold defendant Sanderson one undivided half of the lot and mill for the sum of $2,000, to be paid by Sanderson to McGlashen upon his advances to Little, and Sanderson to have a deed in fee in his own right of said half, and said McGlashen a deed in fee of the other half, to be by him held as security for the balance of Little's indebtedness.   To carry this out, McGlashen, under an agreement to that effect with Little, on October 26th, compromised said Little's indebtedness to Akers for $500, which he paid, and took an assignment in writing from Akers to himself and Sanderson of said written contract; and, about the same time and for the

like purpose, that is, to carry into effect the above mentioned agreement, Little and McGlashen, as before stated, procured Lawther to take their security for the purchase price of said lot, and to execute to said McGlashen and Sanderson a deed of said lot in fee "under the sale and arrangement aforesaid;" prior to which time, but subsequent to the placing of said engine in said mill, and "*under the sale to them as aforesaid*," said Little had surrendered possession of said premises to said McGlashen and Sanderson.

On these facts it is apparent that, whatever McGlashen's interests, as between Little and himself, in this property, may be under this deed, he obtained it and them under, by virtue, and in pursuance of an agreement with Little as the owner of the property. Whatever his title may be, it comes to him through Little as truly, though not so directly, as if Little, not Lawther, had held the legal title and executed the deed. He is, therefore, as against Little and those claiming under him, estopped to say that Little was not really the owner. To allow him to say so to their injury would be a fraud on them.

Suppose, which is by no means to be assumed, that this arrangement was wholly verbal, and that McGlashen has got a deed and possession through Little's agency, as aforesaid, upon a verbal promise to Little, that he would hold the deed, when he got it, as security, it would be one of the plainest cases of fraud imaginable in him to repudiate his promise; a fraud that no court of equity would ever allow to be successfully perpetrated. *Browne on Stat. Frauds, ch.* 19, *sec.* 441.

To allow him to defeat the lien of the plaintiffs, (if any they otherwise have,) by denying that Little was the equitable owner of the property when he contracted with them for said engine, would be quite as bad, if no worse; for it was to enable Little to resume work and repay McGlashen his advances, that ↖ agreed to furnish Little the supposed cost of a new engine.

It was directly in McGlashen's interest that it was agreed that Little should go to Chicago, and purchase it of plaintiffs, (whose names they had,) or of other parties, upon the best terms practicable; and before said engine arrived, McGlashen was informed by Little of the terms of the contract with plaintiffs, and therefore, by means of Little's dealings as owner at McGlashen's request, McGlashen, if he could be allowed to deny Little's ownership, would knowingly pocket the plaintiffs' property to the extent of one half the unpaid price of the engine.

On the plainest principles of equity and good conscience, therefore, as well as on the express finding of fact above mentioned, we are to consider Little as the equitable owner of this property at the time of the contract with plaintiffs; and there is no manner of doubt whatever that under our lien law of Aug. 12, 1858, which governs the rights of the parties, and which is identical with the general statutes in this respect, one who furnishes "materials or machinery for erecting, constructing, altering or repairing * * * any * * mill, * * * by virtue of a contract or agreement, with the [equitable] owner thereof, shall have a lien to secure the payment of the same upon such * * mill," together with his "right title and interest in and to the land on which it is situated," (*Comp. Stat. ch.* 86, *sec.* 1,)—that is to say, that the word, "owner," in such statute includes as well the owner in equity as at law.

The point was not raised, it being taken for granted that such was the case, in Tuttle vs. Howe, 14 Minn. 145; Hodgins vs. Heaney, 15 Minn. 185; Hodgins vs. Heaney, Jan. T. 1871.

We think it is apparent, on the face of the statute, that such is the intention of the law, and in principle there is no reason why it should be otherwise. The equitable owner, Little for instance, under the contract with Lawther had the fee simple in equity to all intents, subject to Lawther's lien for

unpaid purchase money, and Akers' for *his* claim. Lawther was the trustee for him of the legal estate, which he could call for at any time by paying said claim. *Chemedlin vs. Prince*, 15 *Minn.* 331.

It is true that in Massachusetts, under a statute giving a lien by virtue of an agreement with the owner, it is held that a legal estate only can be subjected to the lien. (*Peabody vs. Eastern Methodist Soc.*, 5 *Allen* 540.) However proper a construction this may be of the law of a state, which had never granted its courts full equity powers, we think it is not to be followed by courts whose jurisdiction extends to all cases in equity as well as at law.

·Thus, in Iowa, one in possession of land under a bond for a deed, is so far the " owner" as to enable a mechanic, contracting with him, to acquire a lien on the premises to the extent of his estate or interest. *Monroe vs. West*, 12 *Iowa* 119. *See also Smith vs. Moore*, 26 *Iowa* 392.

It is true that the lien, being upon an interest subject to the rights of the vendor, cannot be paramount to those rights. It is no more paramount to a vendor's lien, than to the lien of a prior mortgage. (*Chouteau vs. Thompson*, 2 *Ohio State Rep.* 114; *Harsh vs. Morgan*, 1 *Kansas* 293; 11 *Ohio State Rep. p.* 5S.) But if plaintiffs furnished this engine and appurtenances for the construction or repair of this mill by virtue of a contract with Little, they had a lien to secure payment therefor on the lot and mill.

The lien law of Ohio is substantially identical in phraseology on this point with our own. It has been held in that state, that if a material man sells his wares with no understanding, express or implied, as to their application, he can assert no lien upon the building in which they may be placed. *Chouteau vs. Thompson*, 2 *Ohio St. Rep.* 114.

So in Iowa, under a similar statute, it is held, that the law

contemplates that the parties shall mutually understand that the material is to be used, and is furnished to be used about the erection or reparation of a building. If it was sold, however, to defendant, and he got it for the purpose of erecting or repairing a building, if this was the mutual understanding or agreement of the parties, the material man would have a lien, though the particular building was not, at the time, understood, referred to or mentioned; that when the law of Iowa speaks of material furnished especially for any building, it means for building or repairing purposes, as contradistinguished from general or unknown purposes, rather than that it shall be furnished especially for any particular house or building. *Cotes vs. Davies*, 8 *Clark* 416.

A narrower construction than this could not, in our opinion, fairly interpret our own statute. As, however, it is broad enough to secure to the present plaintiffs the right to a lien, we shall not now stop to consider whether or not the statute will bear a less restricted interpretation.

It is obvious, that, though there be a written contract for such materials, it would by no means follow that a lien should be therein contracted for, or that it should appear by the written contract for what building they were destined. (*Cotes vs. Davies*, 8 *Clark* 416.) If, therefore, it was mutually understood, either expressly or by implication, between Little and the plaintiffs, that this engine was for a steam saw-mill of Little's, they would be entitled to a lien to secure the payment therefor. We think there was such an understanding.

On this point the finding is painfully obscure; but, upon careful consideration, we think that the above is the construction of it most free from objection; and, as it is at the same time most consonant with equity, we shall adopt it.

The finding referred to is as follows: "That said engine, fixtures and machinery were purchased by said defendant Lit-

tle of said plaintiffs as aforesaid, for and to be used upon said lot and in said mill; but there is no evidence that said plaintiffs had any knowledge of *what particular lot or property* the same were designed for or to be located upon." (The italics are ours.)

The first clause of this paragraph, taken alone, imports, it seems to us, that plaintiffs as well as Little knew that the engine was to go into *this very mill*. The last clause excludes such implication; but there is an implication, arising out of its peculiar phraseology and in connection with the first clause, that, though plaintiffs did not know for what particular steam and saw-mill in Red Wing the engine was intended, they did know that it was for a saw-mill in Red Wing belonging to Little. And this construction is supported by the terms of the written contract; for the character of the materials notified plaintiffs that this was an engine for such a mill. It was, moreover, for Little of Red Wing, and was to go to Red Wing.

It is not to be denied, that our construction of this finding is open to criticism; but any other is far more so, in our judgment; for instance, that this was a sale by plaintiffs, without inquiry or information as to whether Little was buying for himself or another, to repair an existing mill or to sell again, is something into which this finding could scarcely be twisted.

But it is objected that the engine was, by the contract, to have been delivered at LaCrosse, on payment there in full before delivery. True, but that provision was changed by the parties, or waived by the plaintiffs, (how or why does not appear,) so that when the engine was delivered to Little at Red Wing, instead of at LaCrosse, and without such payment, the contract was a contract for manufacture and delivery of the engine on credit, as to the unpaid part of the price, payable on demand. If the plaintiffs saw fit, for instance, to waive their right of present payment at LaCrosse, and delivered it

Atkins et al. v. Little et al.

to Little at Red Wing on credit, Little was, of course, no less bound to pay than before ; and if no time of credit was agreed on, he would be bound to pay on demand : moreover, and aside from the finding aforesaid, it would be against all probability that said engine should have been so delivered by plaintiffs, and received by Little, without any understanding express or implied as to its application. The circumstances above warrant the assumption that the plaintiffs parted with their property, upon an understanding that it was to go into Little's saw-mill ; and, the contract being modified as above stated, the plaintiffs' rights in respect of this lien are not to be tested by the state of facts at the time of the making the original contract, to which we understand this finding to refer, but the question is, what was the understanding of the parties at the time of the delivery at Red Wing.

To secure the payment for this engine thus furnished Little for his saw-mill, under a contract with him and used in *his saw-mill*, the statute gives plaintiffs a lien.

There is nothing in the objection, that the plaintiffs are non-residents, and that the contract was made and originally to be performed out of this state. The latter provision, we have seen, was changed, and the contract was performed on plaintiffs' part in Minnesota.

That the contract was made out of the state was also immaterial. (*Gatz vs. Casey*, 15 *Illinois* 189.) And if this cause of action had arisen wholly out of the state, it is not perceived how the case in 3 Minn. 202, arising on ch. 86, Rev. Stat., giving certain proceedings *in rem* against boats, has any application. That case decides that causes of action, arising wholly out of our state, are not entitled to our special remedies, and that if parties seek our courts as the forum to enforce their rights in such cases, they must adopt the common law remedies. A mechanic's lien is a statutory security to which

the term remedy would be as misapplied as it would be in respect to a mortgage.

It is further objected, that plaintiffs have filed no " account" under Pub. Stat. ch. 86, p. 697, sec. 7.  The court finds that the plaintiffs made an " account in writing, of which, and the contract annexed to it, the following are copies:"  It is a detailed statement, among other things, of the engine and appurtenances, and that they were furnished in pursuance of said written contract, to said Little by plaintiffs for, and used in repairing and building said mill; of the amounts paid on the contract price, with the dates of payment, and of the amount unpaid and claimed to be due; and is sworn to, as a true and correct account of the machinery and materials furnished by plaintiffs to and for said Little, who is also stated to have been, at the time the materials were so furnished and used, the owner of the mill and of an equitable interest in said lot.

This contains everything that the form, (which, by said statutes p. 699, sec. 18, may be used,) would include; and that it is not in the form of a bill of parcels, annexed to an affidavit, is of no consequence.

The other objections, made by the respondents to the account in matters of form, do not require consideration.

But it is said, that, in as much as no lien could, under any circumstances, attach, that would not be subject to the contingencies happening to Little's interest, appellants should have seen to it, that Little's interests were perfected, that theirs might be preserved.

The lien attached on the furnishing of the engine, subject to be defeated, if no account were filed within the year, ( *Cogel et al. vs. Mickow,* 11 *Minn.* 475,) and it would certainly have been lost if plaintiffs had lain by and allowed Akers, for instance, to foreclose on Little's interest.   But nothing of the

kind has happened; Little's interest under said written contract has really been perfected, not destroyed.

The case stands in equity precisely as it would if Little, at the time plaintiffs' lien attached, had held the property under a deed from Lawther, subject to a mortgage to Lawther for the purchase money, and a second mortgage to Akers for the cost of the old engine; and the lien would be a third, though statutory, mortgage. The first mortgage Little pays by his and McGlashen's bond; the second with money advanced by McGlashen upon Little's agreement to give him security therefor,—and for that and other advances, Little does give him security by deed. Whether the deed comes from Little or Lawther is immaterial. It is given to carry out the arrangement between Little and McGlashen to give him such security, and McGlashen holds it as such, and it is in equity but a mortgage,—the agreement for which was made and the mortgage executed subsequent to plaintiffs' mortgage.

If the owner of land on which a building has been erected, for which a lien has arisen under the statute, can defeat that lien by selling and conveying the property within the year allowed for filing the account, so as to give his vendee the title free and clear of such lien, then McGlashen would hold the undivided half of the property, in security for Little's debt to him, free of plaintiffs' lien, though Little's interest as mortgagor would be bound thereby; and Sanderson, also, would hold his half free therefrom, provided they took said deed without notice of plaintiffs' lien.

It is settled in this state, however, that a material-man's lien attaches as against a person, who in good faith and without notice purchases the premises subsequently to the erection of the building, in which the materials are used, and prior to the filing the account. (*Cogel vs. Mickow*, 11 *Minn.* 475.) The property, in the hands, therefore, as well of Sanderson the

owner of . the one, as of McGlashen, who, on these findings, must be deemed in equity the mortgagee in possession of the other undivided half, is subject to the plaintiffs' lien, and the conclusion of law of the district court, that the plaintiffs have no lien thereon, is erroneous.

It is not necessary, however, to send the case back for a new trial because of such erroneous deduction from the findings of fact. So much of the judgment as declares, in accordance therewith, that plaintiffs have no lien, and are entitled to no judgment establishing or enforcing it, is reversed; and, in lieu thereof, let judgment be entered, adjudging and declaring a lien in plaintiffs' favor to the amount of their claim, as determined in the judgment against Little, on said property from Oct. 22d, 1865, and that the estate of Sanderson in said property and McGlashen's interest therein are subject thereto.

As to the enforcement of the lien, sec. 11 of ch. 90 of Gen. Statutes does not apply here. A sale of the property on execution, would seem to be an efficient and sufficient mode of enforcement. The certificate, if no redemption were made from the sale, would operate as a conveyance to the purchaser of all Little's right, title, interest and estate on Oct. 22d, 1865. (*Gen. Stat., ch. 66, sec. 29.*) Little was then the owner in equity, but could not get the legal estate without paying off Lawther and Akers; but these claims have been wiped out, and the purchaser at such sale would take the equitable fee as unincumbered by them, as he would do, if, the day after the lien attached, Lawther and Akers had gratuitously released them to Little. In that event the purchaser's right to call on Lawther for a deed would be absolute, and he occupies the same position here with respect to these grantees of Lawther.

The judgment appealed from will be modified in accordance with the views above expressed.